UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 08-60030-CIV-MIDDLEBROOKS/LYNCH

JILL LETTELIER,

    Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner,
Social Security Administration,

    Defendant.
_____/



FILED by _____ D.C.

APR - 9 2009

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

## REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 16)

**THIS CAUSE** comes before this Court upon the above Motion. Having reviewed the Motion, Response, and administrative record, and having held a hearing thereon on April 7, 2009, this Court finds as follows:

### BACKGROUND

1.  The Plaintiff applied for disability insurance benefits under Title II of the Social Security Act in March 2005. Her application was denied initially and after reconsideration, and in September 2006, following a hearing, an Administrative Law Judge ("ALJ") rendered a decision finding the Plaintiff not disabled under the terms of the Act. The Appeals Council denied the Plaintiff's Request for Review on November 15, 2007, thereby leaving the ALJ's decision final and subject to judicial review.

2.  The Plaintiff claims disability due to the residuals of

Page 1 of 14

a severe 1976 car accident, namely, injuries to her right shoulder and head. As a result she has had poor use of her right arm (she is right-hand dominant) and poor short-term memory. The impairments have progressively worsened. The Plaintiff claims an amended onset date of August 9, 2005, coinciding with the end of her unemployment benefits.

   3.   At the time of the hearing, held August 2006, the Plaintiff was 53 years old. She has a high school education, and in 1980 she attended a legal secretary/computer program although it is unclear whether she successfully completed it. At the hearing, she recalled her work history: From 1986 until 1994 she worked at a travel agency where her mother, who also worked there, assisted her. (At the hearing she said she had worked there only for a few months.) She was fired soon after her mother retired. Beginning in 1998 she worked as a fabric trimmer, also under benevolent circumstances — the manager helped her keep track of her tasks. She stated that she was fired at the end of January 2005. (She told the consultative examiner, Dr. Brooks, that she had quit because of shoulder pain.) She also claims to have been fired from other, unidentified jobs because of memory difficulties and shoulder pain.

   4.   The medical record begins with the treatment notes of Dr. Israel, the Plaintiff's general physician. Since as early as 1998, he had been treating the Plaintiff for miscellaneous

matters such as urinary infections and high cholesterol. In November 2002 Dr. Israel noted "chronic shoulder pain from an old injury" for which he referred her to Dr. Taylor for an orthopedic evaluation.

5. In late 2004 the Plaintiff also was seeing Drs. Crastnopol and Krant, both orthopedists, for her right shoulder pain. That October Dr. Krant wrote Dr. Israel regarding the Plaintiff's condition. The doctor recalled the Plaintiff's history of a severe fracture following the car accident, adding that in 2002 the Plaintiff fell and re-fractured her shoulder. (The medical record contains no notes regarding this second shoulder injury.) The doctor diagnosed arthritis with marked bony deformity and painful abduction. He deemed her a candidate for either a fusion or total replacement of the shoulder.

6. In November Dr. Taylor wrote Dr. Israel regarding the Plaintiff's shoulder. He observed a marked loss of motion and a shoulder joint that already is nearly fused. Unlike Dr. Krant, he did not feel that the Plaintiff was a candidate for any sort of surgery, and instead he recommended further radiographic study. A CT scan and an MRI taken of the shoulder that December revealed extensive post-traumatic deformity with joint degeneration, swelling, proliferative synovitis, and extensive muscle atrophy. In March 2005, after reviewing the radiographs, Dr. Taylor diagnosed the Plaintiff as having "an extremely difficult

problem", but he remained uncertain about the appropriate course of treatment. Dr. Israel noted in February 2005 that the Plaintiff was continuing to see Dr. Crastnopol.

7. The Plaintiff also suffered from recurrent urinary tract infections and other urological ailments. For this the Plaintiff saw Dr. Gittelman, a urologist. In addition, CT scans in January 2005 revealed the presence of a stone and a cyst in the Plaintiff's kidneys.

8. In April 2005 the Commissioner sent the Plaintiff to Dr. Brooks for a consultative examination. She reported memory problems, right shoulder pain, and loss of right shoulder movement. She stated that she still can dress and feed herself and do a wide range of housework. She has a full ability to walk, sit, and climb stairs, although she can stand for only five minutes at a time. She can lift up to 20 lbs. and can drive a car for 45 minutes. She takes over-the-counter pain medication. Upon examination, the Plaintiff had no difficulty moving about the room, although she did hold her right arm to her side. The physical examination was mostly normal except that she had significant loss of motion through her right upper extremity with some loss of grip strength. She retained full bilateral use of her hands. The Plaintiff was able to answer questions appropriately and interact well during the interview.

9. Also that April the Commissioner sent the Plaintiff to

Dr. Besner for a consultative psychological evaluation. On this occasion the Plaintiff reported a narrower range of daily life activities: difficulty with personal care, cooking, and lifting heavy objects. The psychologist observed no loss of physical functioning although she held her arm and shoulder. Furthermore the Plaintiff conversed and interacted appropriately and was able to participate adequately although her task persistence was moderate. The Plaintiff's performance on the cognitive tests was adequate, except for recent memory which was poor. The psychologist diagnosed major depressive disorder, recurrent, severe without psychotic features; unspecified anxiety disorder; and unspecified cognitive disorder. As for the conditions' impact on mental functioning, the psychologist stated in a somewhat equivocal fashion that the Plaintiff may have cognitive and emotional difficulties performing workplace activities and may need help managing benefits.

    10. The Plaintiff returned to Dr. Besner in August for memory testing. Her physical functioning was normal and her mental functioning was adequate, as before. Of the eight kinds of short-term memory tested, the Plaintiff was average to low average in two and borderline to deficient in the others. Dr. Besner opined that the Plaintiff's overall memory performance suggests cognitive limitations caused by an organic condition. The doctor offered a guarded prognosis.

11. Also that August a CT scan was taken of the Plaintiff's abdomen. It revealed a stone in the right kidney and a "subtle" cyst in the left kidney. It also revealed mild splenomegaly and colonic diverticula without evidence of acute diverticulitis. In March 2006 Dr. Minars performed an incision to drain a ruptured cyst. Repeat CT scans were taken in June 2006, and they revealed signs of a stone or scar in the right kidney, a simple cyst in the left kidney (with no gross abnormalities or pathology), and post-surgical changes.

12. In mid 2006 the Plaintiff began complaining of toe pain, and Dr. Israel referred her to Dr. Sinkoe, a podiatrist. The Plaintiff also saw Drs. Israel and Gittelman for a reoccurring urinary tract infection during this time. No mention of shoulder pain or memory problems is made in these treatment notes.

13. In July 2005 a non-examining DDS medical advisor rated the Plaintiff's physical residual functional capacity ("RFC"). The first advisor, Dr. Peele, rated the Plaintiff capable of performing medium exertional work with unlimited push/pull but with limited reaching and avoidance of hazards. In December 2005 a second advisor, Dr. Holifield, a cardiologist, rated the Plaintiff capable of light exertional work with unlimited push/pull, no climbing, and limited reaching.

14. Medical advisors also rated the Plaintiff's mental RFC.

The first advisor, Dr. Kirk, found the Plaintiff to have organic mental and affective disorders. However he saw no basis for significant mental restrictions due, in part, to the lack of evidence of worsening, the Plaintiff's daily life activities, and her substantial work history. Instead Dr. Kirk found the Plaintiff only moderately limited in the areas of understanding, remembering, and executing detailed instructions and the ability to maintain concentration for extended periods. A second advisor, Dr. Register, found the Plaintiff to have only an affective disorder. She noted mild depression, variable task concentration, and frustration, with the later two (as opposed to an organic disorder) limiting the Plaintiff's short-term memory and only on an occasional basis. Dr. Register found the Plaintiff to have the same moderate limitations as Dr. Kirk did, adding that she remains capable of simple, routine, and low stress tasks.

15.  The Plaintiff testified at the hearing that she suffers from memory loss, a right shoulder defect, and a ruptured kidney cyst along with kidney stones, an enlarged spleen, and chronic diverticulitis. Consequently she has poor short-term memory; little use of her right arm, e.g., she is unable to raise it above head or shoulder height, press down, or lift weight; and limited standing. In RFC terms, she stated that she can lift a gallon of milk, retains use of her hands, and can reach out with her left arm.

16. In terms of daily life activities, the Plaintiff stated that she spends the usual day watching TV or visiting with a neighbor. She does light housework, some cooking, and some shopping. She can drive short distances but needs help finding new addresses. She clarified that she babysit her grandchildren only for a month, but had to stop because they were too energetic.

17. Also testifying at the hearing was a vocational expert ("VE"). The ALJ proposed a hypothetical based on light exertional work, limited right arm reaching above the head, and routine, repetitive jobs. The VE answered that while such a person could not perform the Plaintiff's past relevant work, such a person could perform other jobs such as lens inserter, small products assembler, fruit distributor, and ironer. The Plaintiff proposed a hypothetical based on "moderate" concentration ability, i.e., the ability to concentrate for just two-thirds of a day, and the VE answered that no amenable work — even simple, routine work — would be available.

18. The ALJ found the Plaintiff to have the severe impairments of (1) past traumatic closed head injury with short-term memory loss and (2) past right shoulder injury, status post surgery, with resulting decreased range of right shoulder and elbow motion. The ALJ next reviewed the Plaintiff's medical history.

19. With respect to the Plaintiff's general physician, Dr. Israel, the ALJ observed that in his treatment notes he made no comment regarding the Plaintiff's memory and no recent comment regarding the Plaintiff's shoulder pain. Dr. Taylor, the Plaintiff's orthopedist, observed restricted scapulothoracic motion, some crepitus (joint crackling), and pain, but he was uncertain as to the best course of treatment — whether simply continued observation or some sort of surgical intervention. The Plaintiff did not return, however, and she sought no further orthopedic care. The ALJ noted the observations of overall normal functioning made by the two consultative doctors. With respect to the memory testing specifically, the ALJ found that her performance revealed no severe memory or concentration problems overall.

20. The ALJ discounted the Plaintiff's subjective allegations. The ALJ regarded the Plaintiff's treatment as routine and conservative in nature, and he saw nothing in the treatment notes that confirmed the presence of a wholly disabling medical condition. He saw no progressively worsening health reflected in the Plaintiff's earnings history; to the contrary, her last seven years of employment had been her highest paid. Lastly the ALJ noted the Plaintiff's receipt of unemployment benefits which he regarded as implying a willingness to return to work.

21. The ALJ gave weight to the advisory RFC ratings for being supported by specific reasons and grounded in the record evidence. Notwithstanding this, the ALJ found the Plaintiff to have only mild (as opposed to moderate) restrictions in the various domains of mental functioning.

22. The ALJ found the Plaintiff capable of performing light work subject to two limitations. First the Plaintiff cannot reach above her head with her right hand on a repetitive basis and possibly only could do so on an occasional basis. Second, due to her memory problems, the Plaintiff is limited to routine, repetitive jobs involving no decision-making. This RFC leaves the Plaintiff unable to return to her past relevant work. However the ALJ found the Plaintiff capable of performing the other, more amenable jobs that the VE identified. The ALJ therefore concluded that the Plaintiff is not disabled.

## DISCUSSION

Judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence and whether the proper legal standards were applied. See Lewis v. Callahan, 125 F.3d 1436 (11th Cir. 1997). Supporting evidence need not be preponderant to be substantial so long as it amounts to more than a scintilla. In other words, it is such relevant evidence that a reasonable person might accept as sufficient and adequate to support the conclusion reached. See

id. at 1440. If the decision is supported by substantial competent evidence from the record as a whole, a court will not disturb that decision. Neither may a court re-weigh the evidence nor substitute its judgment for that of the ALJ. See Wolfe v. Chater, 86 F.3d 1072 (11th Cir. 1996). See also, Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). While the Commissioner's factual findings enjoy such deference, a court is free to review the Commissioner's legal analysis and conclusions de novo. See Ingram v. Comm'r, 496 F.3d 1253, 1260 (11th Cir. 2007).

The Plaintiff first objects to the ALJ's consideration of Dr. Besner's reports. During the hearing, the ALJ commented that he never accords weight to the opinions of this particular psychologist, and for this reason, the Plaintiff contends that the ALJ was biased against Dr. Besner. This despite the fact that it was the Commissioner who solicited Dr. Besner — twice — to evaluate the Plaintiff. The question of whether the ALJ is improperly biased against Dr. Besner need not be answered, however, because it has no affect on the decision. The ALJ included Dr. Besner's reports in his analysis, and he gave an express rationale for finding it unsupportive of the Plaintiff's disability claim. Therefore, regardless of bias, the analysis still lends itself to adequate judicial review against the record evidence. The Plaintiff raises the additional argument that the

ALJ erred by not addressing certain facets of Dr. Besner's reports supportive of her claim. These include the complete results of the memory tests; the doctor's comments regarding the Plaintiff's difficulties with daily life activities and work; and the guarded prognosis. The ALJ did discuss Dr. Besner's reports overall, but to the extent the ALJ does not account for the more severe results of the objective memory test, namely, the areas of substantial memory deficits, the objection is sustained.

The Plaintiff's second objection concerns the ALJ's decision to end the hearing without letting her mother testify as a witness. The ALJ did so primarily due to the length of the hearing but also because the mother did not live with the Plaintiff (implying that she lacked personal knowledge of the Plaintiff's functional ability) and that the record already provided a sufficient basis by which to rule. The attorney sought to question the mother regarding the Plaintiff's "memory problems because she was at work with her". Contrary to the ALJ's decision, this would have been relevant, non-cumulative evidence: the mother had personal knowledge of how the Plaintiff's memory impairment affected her ability to work. This is an important area of inquiry because key to the Plaintiff's claim was her work history and the extent of her dependence upon benevolent work conditions. It may not be accurate to deduce from the Plaintiff's work history some minimal capacity for work, the same minimum

capacity underlying the RFC assessment. Instead the mother may corroborate the Plaintiff's own testimony regarding her work difficulties, and together with the Plaintiff's borderline to deficient short-term memory skills, may warrant a different outcome to the disability analysis.

The Plaintiff does not place the same emphasis on her shoulder injury, but upon independent review the ALJ's findings regarding this particular impairment enjoy minimum evidentiary support. The medical record establishes that the Plaintiff has a significant shoulder impairment. Dispositive to the Plaintiff's claim therefore was the degree of that impairment, and on this point there is evidence that her shoulder was not completely disabling. She retained some functional use of her right upper extremity; she took mild pain medication; for the period of time when she did seek medical care for it, no clear course of treatment was offered; and there is no evidence of a worsening condition. As for the Plaintiff's kidney/urinary condition, there is no evidence of functional impairment, e.g., impaired standing. It follows that the Plaintiff failed to meet the Eleventh Circuit's pain standard. See Dyer v. Barnhart, 395 F.3d 1206, 1210-11 (11th Cir. 2005) (providing a detailed application of the Holt pain standard and pain credibility analysis). Moreover many of the factors provided at 20 C.F.R. § 404.1529(c)(3) for measuring the intensity and functional impact of subjective pain

weigh against the Plaintiff's disability claim.

## CONCLUSION

Without the mother's testimony, the record is incomplete, and as such, this Court cannot judge whether the ALJ's decision enjoys the support of competent, substantial evidence. Consequently the case should be remanded to further develop the record by allowing the mother to testify. The ALJ then shall reconsider the Plaintiff's RFC in light of the complete evidentiary record and, if need be, submit the new RFC assessment to a VE regarding the availability of amenable employment.

**ACCORDINGLY,** this Court recommends to the District Court that the Plaintiff's Motion for Summary Judgment be **GRANTED** and that the ALJ's decision be **REVERSED** and **REMANDED** for reconsideration pursuant to the above instructions.

The parties shall have ten (10) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable Donald M. Middlebrooks, the United States District Judge assigned to this case.

**DONE AND SUBMITTED** in Chambers at Fort Pierce, Florida, this 9th day of April, 2009.

FRANK J. LYNCH, JR.
UNITED STATES MAGISTRATE JUDGE

cc: Hon. Donald M. Middlebrooks
    Adam Neidenberg, Esq.
    Carole M. Fernandez, AUSA